The Honorable John C. Coughenour

1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

16

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH DANIEL SCHMIDT,<br><br>Defendant. | NO. CR23-158 JCC<br><br>UNITED STATES SENTENCING<br>MEMORANDUM |

17

18    **I.      Introduction.**

19           Over the course of several months, Joseph Schmidt committed numerous acts of

20    espionage against the United States. Schmidt created documents containing classified and

21    other national defense information for the purpose of providing that information to agents

22    of the Chinese government. He later successfully delivered that information to Chinese

23    intelligence officers. Schmidt now admits these crimes and expresses remorse for them.

24    He claims that they were fueled entirely by his struggles with mental health issues,

25    including delusions stemming from schizophrenia.

26    //

27    //

      //

United States' Sentencing Memorandum - 1
*United States v. Schmidt*, CR23-158 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The government acknowledges that Schmidt's mental health struggles are legitimate and serious, and that they contributed to Schmidt's criminal conduct. However, Schmidt's crimes were much more than an involuntary response to delusions, and he bears responsibility for them.

During the time period charged in the indictment – the first half of 2020 – Schmidt's mental health issues were more managed than they later became in 2022 and beyond. His offense conduct involved repeated acts of directed and deliberate conduct. Schmidt created detailed documents containing classified and national defense information; researched how to covertly contact Chinese intelligence officers through obscure state-sponsored entities; and disseminated the classified information to intelligence officers in surreptitious ways. And while Schmidt's delusions may have, in part, motivated this conduct, he had other, more rational, reasons as well. Specifically, he was attempting to obtain legal immigration status in China and had been frustrated by China's strict COVID-19 pandemic policies. His acts of espionage were designed to curry favor with the Chinese government in the hopes of obtaining the immigration status he sought.

There are several important aspects of this case that the Court will need to balance in determining the appropriate sentence: the extremely serious nature of Schmidt's crimes; the leniency Schmidt received in the plea agreement by avoiding a more serious offense that would have carried a much higher Sentencing Guidelines range; the mitigating evidence of Schmidt's mental health issues; and the need for the Court's sentence to provide adequate general deterrence against similar crimes. For the reasons set forth below, after weighing these factors, the government recommends that the Court impose a sentence of 84 months, near the high end of the Guidelines range.

## II.     The Sentencing Guidelines Calculations.

The government concurs with the Sentencing Guidelines calculations set forth in the Presentence Report. The total offense level is 27 and Schmidt falls within Criminal History Category I, which yields an advisory sentencing range of 70-87 months.

United States' Sentencing Memorandum - 2
*United States v. Schmidt*, CR23-158 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## III.    Sentencing Recommendation.

The government recommends that the Court sentence Schmidt to a total term of imprisonment of 84 months and a term of supervised release of three years, with all the conditions of supervised release recommended by the Probation Office. The various statutory sentencing factors support a custodial sentence of 84 months in this case, including, most prominently, the nature and circumstances of the offense; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; the history and characteristics of the defendant; the need for the sentence to afford adequate deterrence to criminal conduct; and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

### A. The Nature/Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense and to Provide Just Punishment.

Schmidt's acts of espionage were extremely serious crimes. His offense conduct is summarized in detail in several documents filed with the Court, and the government will not repeat all of that here. *See* Plea Agreement ("PA") at 5-10; PSR ¶¶ 13-36; Declaration of FBI Special Agent Tower ("Tower Declaration") at 6-21.[1]

Schmidt abused his position as a human intelligence officer for the U.S. Army and compromised the national security interests of the United States. He compiled and disseminated to the Chinese government documents containing classified and national defense information about various aspects of U.S. Army human intelligence collection, including methods of conducting interrogations and human source operations; and tradecraft used by human intelligence collectors, such as source types, recruiting methods, information regarding surveillance detection routes, casing for meeting locations, source assessment, and operational testing. Qualified Army personnel have reviewed the information Schmidt disseminated and concluded that much of it was

---

[1] The Tower Declaration is filed as Dkt. 6-1 in this matter. The government is also attaching the declaration as *Exhibit 1.*

United States' Sentencing Memorandum - 3
*United States v. Schmidt*, CR23-158 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

classified at the SECRET level, meaning that its disclosure reasonably could be expected to cause serious damage to the national security of the United States.

There are two aspects of Schmidt's offense conduct that are particularly important to highlight. First, Schmidt was well aware of the sensitive nature of the information he disseminated and the value it had for the Chinese government. As he described it in his own words:

> If you read this document, please make sure that the State Security Bureau of People's Republic of China [MSS] receives it. *The content is a high-level secret of U.S. intelligence and can help the Chinese people*. ... I'm a human intelligence collector that just got out of the military. I'm trying to send some information to the Chinese government about the United States Intelligence Services. … I also have experience *with highly classified technology* that I would be happy to share with you if you would like my expertise. (PA at 7-8) (emphasis added)
>
> *****
>
> I am a retired United States Army Intelligence Agent. I have a Secret Internet Protocol Routing PKI token that I would like to reverse engineer to give to the Chinese government. This type of card is what US intelligence agencies use to gain access to SIPR, the intelligence network with TOP SECRET documents and information. *It is a very rare card to find outside of the intelligence community, and if used properly, it can improve China's ability to access the SIPR network.* (PA at 9) (emphasis added)

Second, Schmidt's offense conduct involved a long-term pattern of directed and deliberate actions that he took over the course of several months. Schmidt was acting rationally in carrying out his goal of disseminating information to the People's Republic of China ("PRC") intelligence officers. For example:

- In February 2020, while in Turkey, Schmidt conducted internet research about defection from the United States and countries that do not have extradition treaties with the United States, including making Google searches for: "chinese consulate"; "soldier defect"; "chinese embassy"; "countries that dont [sic] extradite"; and "can you be extradited for treason." (PA at 6)
- Schmidt meticulously drafted several documents containing classified and national defense information. PA at 7-9. Some of these documents were

United States' Sentencing Memorandum - 4
*United States v. Schmidt*, CR23-158 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

lengthy and detailed (*e.g.*, *High Level Secrets*, 23 pages long; *Important Information to Share with Chinese Government*, 22 pages long). PA at 7-9. Schmidt created these documents based on his knowledge and experience as an Army human intelligence officer.

- Schmidt displayed some operational security measures, such as consistently expressing the desire to meet in person with intelligence officers rather than communicate electronically. *See, e.g.* PA at 6 ("I would like to go over the details with you in person if possible, as I am concerned with discussing this over email."); Tower Declaration at 13 ("I will only discuss this technology in person if I can meet with a qualified member of the Chinese Security Bureau."). Schmidt later went to the headquarters of the Chinese Ministry of State Security ("MSS"). PA at 7.

- Schmidt figured out how to initiate contact with Chinese intelligence operatives by reaching out through obscure PRC state-owned enterprises. He conducted research and successfully identified two state-owned enterprises, "SOE 1" and "SOE 2," that he determined were under the direct control of the PRC State Council and the PRC Ministry of Science and Technology, respectively. He then contacted those entities to pass his information to intelligence officers. PA at 9; Tower Declaration at 16, 19.

- Schmidt's criminal conduct was motivated by his rational desire to obtain immigration status and work authorization in the PRC. After his arrival in Hong Kong in early March 2020, he had been trying to obtain employment in China and a PRC work permit/visa so he could permanently relocate to China. Tower Declaration at 20. However, due to a variety of factors, including China's policies in response to the COVID-19 pandemic, Schmidt was having trouble obtaining a PRC visa. *Id.* On August 7, 2020, Schmidt finally received a work permit from the PRC. Tower Declaration at 21. This was only *17 days after his solicitation email to SOE 2*, in which he stated: "I am in possession of Top Secret Clearance/Secret Compartmentalized Information from the US, as

United States' Sentencing Memorandum - 5
*United States v. Schmidt*, CR23-158 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

well as a PKI card of the Secret Internet Protocol Routing Network [], which I need to pass on to your company." PA at 9-10.

**B. The Defendant's History and Characteristics.**

Schmidt's history and characteristics are mitigating; primarily, his struggle with mental health issues and how this contributed to his offense conduct. The government's recommendation of an 84-month sentence – although close to the high end of the Guidelines range – adequately accounts for the mitigation in Schmidt's background. There are three reasons for this.

First, the government extended great leniency to Schmidt through its agreement not to charge him with the more serious offense of *Gathering or Delivering Defense Information to Aid Foreign Government*, in violation Title 18, United States Code, Section 794(a). The § 794 offense would have resulted in a base offense level of 37 under USSG § 2M3.1(a)(2), as compared to a level 30 for the charged § 793 offenses. The total offense level for a § 794 offense would have been 34, with a corresponding Guidelines range of 151-188 months – *more than double* the current range of 70-87 months.

Second, Schmidt's Guidelines range of 70-87 months would be the same if: (a) his conduct had pertained to a *single* classified document; (b) he had simply *retained* the classified information without attempting to *disseminate* it; or (c) he had *attempted* to disseminate the classified information but was unsuccessful in doing so. But here, Schmidt's conduct was far more egregious. He compiled multiple classified documents, some of which were extremely lengthy and detailed. And not only did he unlawfully retain these documents – he successfully disseminated the information to Chinese intelligence officers.[2] The seriousness of Schmidt's conduct – as compared to much lesser conduct that would result in the same Guidelines range – supports a sentence near the high end of the range.

---

[2] Although Count 1 of the Indictment charges Schmidt with *attempting* to deliver national defense information, the government's post-indictment investigation has established that Schimdt, in fact, successfully disseminated the information.

Lastly, the time period charged in the indictment – the first half of 2020 – was a period during which Schmidt's mental health issues appear to have been less severe than they later became. Although Schmidt's symptoms were present prior to his discharge from the Army in late 2019, and persisted to some degree through 2020 and 2021, it was not until 2022 that his thinking became more heavily dominated by his delusions. This is consistent with the evidence uncovered during the government's investigation, which reflects Schmidt's rational and directed offense conduct during 2020. It is also consistent with the information about Schmidt's background in the Presentence Report. For example, in 2021, Schmidt was married in Hong Kong, held a job as a teacher, and graduated (remotely) from Arizona State University with a bachelor's degree. PSR ¶¶ 72-73, 102. Schmidt reports that, during this time, he was able to "somewhat manage" his mental health condition. PSR ¶ 72. But by 2022, "his mental health had significantly deteriorated" and things fell apart with his wife and job. PSR ¶ 73.[3]

### C. The Need to Afford Adequate Deterrence to Criminal Conduct.

While Schmidt is undergoing appropriate psychiatric treatment, he may not present a significant risk of recidivism and therefore the need for *specific* deterrence may not loom large. But it is important for the Court's sentence to afford adequate *general* deterrence against others who may seek to engage in similar criminal conduct in the future. In doing so, the Court's sentence should vindicate the government's important interest in protecting its classified and national defense information from disclosure to foreign adversaries. As the Supreme Court has noted, "[i]t is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (citations omitted). And "[e]spionage is one of this nation's most serious offenses." *United States v. Whitworth*, 856 F.2d 1268, 1289 (9th Cir. 1988).

---

[3] Similarly, a forensic psychological evaluation conducted by a defense expert (*see* PSR ¶ 90) noted that, according to Madigan Hospital records, Schmidt's psychotic symptoms were "completely remitted" through antipsychotic treatment by October 7, 2019, prior to his discharge from the Army in December 2019. Schmidt's offense conduct began only weeks later.

United States' Sentencing Memorandum - 7
*United States v. Schmidt*, CR23-158 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### D.  The Need to Avoid Unwarranted Sentencing Disparities

Recent sentences in similar cases across the country also support a custodial sentence of 84 months. For example, in *United States v. Schultz*, the court sentenced the defendant in April 2025 to 84 months in prison after he pleaded guilty to conspiring to transmit national defense information to someone he believed was associated with the Chinese government, in violation of 18 U.S.C. § 793(g). *See* Case No. 3:23-cr-00056 (M.D. Tenn.). Like Schmidt, the defendant in *Schultz* was a TOP SECRET clearance holder in the U.S. Army who suffered untreated mental health issues during the time of his criminal conduct. Similarly, in *United States v. Slater*, the court sentenced the defendant (a U.S. Air Force employee) earlier this month to 70 months in prison after he pleaded guilty to conspiring to transmit national defense information to someone he met online who he believed was living in Ukraine.  *See* Case No. 8:24-cr-00042 (D. Neb.).

Moreover, by allowing Schmidt to plead guilty to a Section 793 violation, instead of a Section 794 violation, the government already significantly reduced his sentencing exposure to account for the mitigating nature of his mental health conditions. Indeed, sentences for Section 794 convictions, which the facts here would support, are typically significantly higher than 84 months. *See e.g.*, *United States v. Dalke*, Case No. 1:22-cr-00313 (D. Colo) (262 months); *United States v. Thompson*, Case No. 1:20-cr-00067 (D.D.C.) (276 months); *United States v. Lee*, Case No. 1:18-cr-00089 (E.D. Va.) (228 months); *United States v. Mallory*, Case No. 1:17-cr-00154 (E.D. Va.) (240 months); *United States v. Ma*, Case No. 1:20-cr-00083 (D. Haw.) (120 months). Accordingly, even when considering Schmidt's mental health conditions, a sentence of 84 months is appropriate to avoid unwarranted sentencing disparities.

//
//
//
//
//
//

United States' Sentencing Memorandum - 8
*United States v. Schmidt*, CR23-158 JCC

**IV.    Conclusion.**

For all the reasons set forth above, the government recommends that the Court sentence the defendant to a term of imprisonment of 84 months and a term of supervised release of three years, with all of the conditions of supervised release recommended by the Probation Office.

DATED this 21st day of October, 2025.

Respectfully submitted,

CHARLES NEIL FLOYD
United States Attorney

*s/ Todd Greenberg*
TODD GREENBERG
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: 206-553-2636
Fax: 206-553-4440
Email: Todd.Greenberg4@usdoj.gov

United States' Sentencing Memorandum - 9
*United States v. Schmidt*, CR23-158 JCC