THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR23-158-JCC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DEFENDANT'S SENTENCING MEMORANDUM |
| | ) | |
| JOSEPH DANIEL SCHMIDT, | ) | |
| | ) | |
| Defendant. | ) | |

## I.    INTRODUCTION

The defense respectfully joins the Probation Department's recommendation for a sentence of time served (approximately 25 months) with three years of supervised release. This case is very unusual. Mr. Schmidt is a kind, patriotic, and idealistic 31-year-old man with no criminal history. He committed this offense as a result of delusions stemming from his schizophrenia, believing he was subject to a mind control network operated by the FBI and hoping to warn the Chinese government about the program.

While serving in the Army as part of a Human Intelligence ("HUMINT") squad, Mr. Schmidt suffered a psychotic break in 2019 and was discharged with 100% disability. He believed that the FBI had planted a chip in his brain to control his actions and punish him for imagined crimes he committed at age six. In 2020, he travelled to China because he felt the world needed to be warned of this invasive new technology. He knew that his claims about a brain-chip program would be met with skepticism. To

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

gain the trust of Chinese intelligence, he provided basic information that is considered protected national defense information. The information was primarily related to his work in the HUMINT squad in which he had previously served. Mr. Schmidt returned to the United States on October 6, 2023, to interview for a job at the FBI in their supposed computer/brain interface program. He was arrested at the airport and has remained in custody since.

This Court found Mr. Schmidt incompetent and ordered hospitalization for competency restoration. Before Mr. Schmidt was restored to competency, his conduct at the FDC SeaTac was frankly bizarre. Under the directions of the supposed computer/brain interface program, he maintained awkward and uncomfortable body positions for hours at a time, refused to eat or sleep for extended periods, and insisted he was communicating with President Biden who was directing him to just plead guilty. Fortunately, competency restoration treatment was successful; Mr. Schmidt responded well to the psychiatric medications he received at FMC Springfield and continues to take at FDC SeaTac. While he still hears voices, he understands the voices are not real. He understands that what he did was wrong and deeply regrets the offense conduct. Ex. 1 (Mr. Schmidt's Letter to the Court). He will do all he can to manage his mental health symptoms in the future so that he never again commits a crime against the United States. *Id.*

Mr. Schmidt parents are supportive and understanding of his mental health issues. Ex. 2 (Parents' Letter to the Court). They wish that they had done more to intervene with their son, particularly after he was discharged from the military. *Id.* They are also committed to helping their son manage his mental illness. *Id.* Mr. Schmidt's parents plan on attending the sentencing hearing. If he is given a time-served sentence, they will be prepared to pick him up from the FDC SeaTac and bring him to their home in Arizona. At the suggestion of the Probation Department, counsel also contacted the

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Schmidt*, CR23-158-JCC) - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

FDC SeaTac, which confirmed it has sufficient stocks of medications to give
Mr. Schmidt a 30-day supply if he is released.

## II.    BACKGROUND

Mr. Schmidt was born and raised in Phoenix, Arizona. PSR ¶ 62. He is the
second oldest of four siblings and grew up in a stable environment in a religious home
where his basic needs were met. PSR ¶¶ 62, 65.

Given his severity of Mr. Schmidt's mental health symptoms and the lengthy
period of time during which they were essentially untreated, he remains uncertain about
certain details of his childhood. While he did not have a true psychotic break until
approximately August 2019, when he was in the military, he did exhibit mental health
issues as a child. When he was about 12 years old, he became "obsessed with prayer,"
spending most of time praying because he was having "unholy thoughts." PSR ¶ 65. In
high school, he often felt depressed and withdrawn. PSR ¶ 66. He dropped out of
college after one semester and suddenly moved to Alaska where he lived for a year.
PSR ¶ 66. He returned to Phoenix and worked in an electrician's apprenticeship
program for a short period before enlisting in the U.S. Army at the age of 20. PSR
¶¶ 66–67.

Mr. Schmidt served in the military from January 2015 to early January 2020.
While in the military, he was primarily based at Joint Base Lewis-McChord. He tested
well and was assigned to work in a human intelligence unit, eventually reaching the
rank of Sargent, the first non-commissioned officer rank. He received the following
military education:

> Advanced Leaders Course (6 weeks)
> Basic Leaders Course (4 weeks)
> Counterintelligence Collections (1 week)
> Defense Language Institute, Chinese-Mandarin (64 weeks)
> Human Intelligence Collector (18 weeks)
> Operational Management (1 week)

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Schmidt*, CR23-158-JCC) - 3

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Human Intelligence Tradecraft (1 week)

Ex. 3 (Certificate of Discharge). He also received approximately six medals or ribbons during his service. *Id*.

Despite his apparent successes in the military, Mr. Schmidt's mental health deteriorated during his service. He became increasingly isolated, anxious, and paranoid. PSR ¶ 67. Eventually, he started experiencing auditory hallucinations, ultimately believing the FBI implanted a device in his brain allowing the FBI and other government authorities to communicate with him and modify his behavior. PSR ¶ 68.

According to records from Madigan Hospital, by September 2019, he was diagnosed with schizoaffective disorder, a family history of bipolar disorder was noted, and he was regularly complaining of microphones being implanted inside of him, resulting in his hearing voices of others talking. Ex. 4 at 6 (Dr. Stanfill Report, filed under seal). At the time Mr. Schmidt's symptoms were noted, the plan was to discharge him from the military as he was considered unfit for duty. *Id*. As his antipsychotic medication was increased, he demonstrated some improvement in reported concerns around brain implants and was more able to challenge the delusions. *Id*. He was eventually discharged from the military in December 2019 and was notified he could not reenlist. *Id*.

Even while still in the military, there were clues that Mr. Schmidt's delusions were leading him to the current offense. According to the discovery, throughout 2019 Mr. Schmidt entered concerning queries into the Google internet search engine, including searches related to medical and/or psychiatric conditions and attempts to find a therapist. However, starting in February 2019, several of the searches appeared to be attempts to communicate directly with some unknown entity. For example, several of these searches started with "sos" [sic]; he referenced voices telling him he was being slandered; and he stated he would report these behaviors to "China" if they did not stop.

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Schmidt*, CR23-158-JCC) - 4

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

Ex. 4 at 5. As noted by Dr. Stanfill, by March 2019, Mr. Schmidt was clearly trying to communicate with an unseen entity in his computer, writing:

> I hope you read this, you understand that I only am trying this because I have no viable way to communicate with you, and that if you actually communicate with me, I'll be entirely cooperative.

*Id*. at 5–6. In February 2019, Mr. Schmidt typed the following search into Google, "[I]f it doesn't stop im [sic] going straight to China." *Id*. at 6.

After his discharge from the military, Mr. Schmidt stopped taking his medications as directed. He spent a short period of time in Arizona with his family. As outlined in his parents' letter to the Court, they attempted to intervene by bringing him to a hospital for involuntary commitment. Ex. 2. However, Mr. Schmidt did not pose a danger to himself or others, so the hospital had to release him. *Id*. His parents wish they could have done more to address his issues and are committed to doing all that they can to make sure Mr. Schmidt is compliant with his medications in the future. *Id*.

Mr. Schmidt left for Beijing on January 4, 2020, but he was sent back due to COVID restrictions. On February 9, 2020, Mr. Schmidt flew to Istanbul, Türkiye, and returned to the United States on March 2, 2020. While in Türkiye, it was clear he was hoping to contact Chinese government officials. Between February 17, 2020, and February 29, 2020, he conducted internet research about defection from the United States, countries that do not have extradition treaties with the United States, and articles about whistleblowing. Ex. 4 at 7. While in Istanbul, he tried to contact the Chinese consulate using his own Gmail account, and during February 2020, he created Word documents on his computer (recovered from his iCloud account) regarding information he would share with the Chinese government. *Id*.

He travelled to Hong Kong in early March 2020 and then to Beijing a few days later. At about that time, he created a document containing information related to

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

national security which was unclassified. The next day, his phone was near Chinese

security headquarters where he presumably provided the documents to the Chinese.

In March 2020, he created another Word document containing secret information

and took photos of his military PKI card, which he later provided to the Chinese.

In April 2020, Mr. Schmidt went to a hospital in Hong Kong to get MRI of his

brain, claiming that he has a family history of brain tumors, but he was actually looking

for proof of the supposed chip in his brain.

In April 2020, Mr. Schmidt met Lesley (Luo) Jingyu through a dating app while

he was living in Hong Kong. Ex. 5 (Investigation Report). Ms. Jingyu is from

Hong Kong and works as a lawyer. They dated for about a year before deciding to get

married in May 2021. *Id*. at 2. Throughout their relationship, Mr. Schmidt hid his

mental illness from his wife; he told her that he received disability benefits from the

military for depression. Eventually, in September 2022, he accused her trying to kill

him in his sleep, and his mental health issues eventually became more apparent over

time. *Id*. at 4. Mr. Schmidt and Ms. Jingyu eventually had a child together, but they

separated before the child was born due to his erratic behavior. *Id*. at 7. Mr. Schmidt

and Ms. Jingyu have since divorced.

On October 6, 2023, Mr. Schmidt flew to United States, believing he would

interview for the supposed FBI brain-chip program, and he was arrested at the airport.

PSR ¶ 7. He had his initial appearance in this district two years ago on October 30,

2023. Dkt. 11. While at the FDC SeaTac, Mr. Schmidt was initially reluctant to take

medications, believing he did not have a mental health issue. Dkt. 23 at 3–4. However,

he eventually agreed to take medications. *Id*. Despite efforts from counsel, the assigned

AUSA, and the Mr. Schmidt's obvious symptoms, the FDC SeaTac did not evaluate

him for medications. *Id*. His condition continued to deteriorate at the FDC SeaTac; he

refused to eat or drink and, if he did eat or drink, he forced himself to sit in certain

positions, believing "the network" required him to do so as punishment. *Id*. The defense moved for a competency hearing on February 23, 2024, based on an evaluation by Dr. Michael Stanfill. Dkts. 22, 23. Dr. Stanfill diagnosed Mr. Schmidt with schizophrenia. Dkt. 23 at 13. Dr. Stanfill concluded Mr. Schmidt was unable to assist in his defense, noting Mr. Schmidt's continued delusional thinking. *Id*. at 8. Dr. Stanfill noted that Mr. Schmidt's primary goal was to make sure the Court was made aware of the government brain-chip program, and he had become convinced the program would benefit society due to its rehabilitative qualities. *Id*. This Court ordered a competency evaluation by the BOP. Dkt. 24.

Mr. Schmidt was then evaluated by Dr. Low, a Bureau of Prisons psychologist at the FDC SeaTac. In her report dated April 24, 2024, Dr. Low found that Mr. Schmidt could not rationally understand the proceedings and consequences due to delusions from schizophrenia. Dkt. 26 at 17. During the evaluation, Mr. Schmidt expressed a number of deeply delusional beliefs, stating the "network gives him guidance about his legal case," that some of the topics shared with him over the network "are secret and the network will execute him if he reveals them," and he wondered if the AUSA, his attorney, and the judge "are all on the network, and how that may affect his case." Dkt. 26 at 17. During the evaluation, Mr. Schmidt discussed the offense and explained:

> [H]is actions were motivated by his desire to obtain help in getting information about the network, and getting the brain interface system out of his head to prove it existed. He wanted to reveal that the American government used this network on people.

*Id*. Dr. Low found that Mr. Schmidt was not competent and "highly recommended" restoration proceedings. *Id*. This Court ordered competency restoration proceedings. Dkt. 27.

Mr. Schmidt arrived at FMC Springfield for restoration on August 15, 2024. Dkt. 29 at 8. Upon arrival, he was experiencing auditory and visual hallucinations,

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

stated his mood was modulated by the chip program, and referenced neologisms. Dkt. 29 at 7–8. He was prescribed psychiatric medications which were increased over time. *Id*. During an interview addressing competency issues on October 11, 2024, he stated his attorney, the prosecutor, and the judge "were all involved in the accountability system." [1] *Id*. at 9. As his medication increased, his delusions persisted but became less severe and he was able to discern between auditory hallucinations and reality. *Id*. at 10.

In the BOP report dated December 13, 2024, the evaluators diagnosed him with schizophrenia. Dkt. 29 at 13. The evaluators concluded that Mr. Schmidt's competency has been restored, stating:

> At the outset of the restorative period, it was apparent that the symptoms of his mental illness were interfering with his ability to rationally make decisions in his legal case. Now, though he continues to think about the accountability system, he now questions its validity and no longer makes decisions based on such beliefs.

*Id*. at 14. Mr. Schmidt told the evaluators that he believes he has a mental illness and plans to take psychiatric medications for the rest of his life. *Id*. at 15.

On February 27, 2025, this Court found that Mr. Schmidt's competency had been restored. Dkt. 32. Mr. Schmidt pleaded guilty on June 24, 2025. Dkt. 40.

## III.    A TIME-SERVED SENTENCE WITH SUPERVISED RELEASE IS SUFFICIENT TO FULFILL THE GOALS OF SENTENCING.

Despite the advisory nature of the Guidelines and the obvious and unique mental health issues that led to this offense, the government recommends a Guideline sentence of 84 months of incarceration. However, a further term of incarceration is not necessary to achieve any of the goals of sentencing. The government's mechanical adherence to the Sentencing Guidelines ignores the relevant sentencing factors, particularly the

---

[1] The "accountability system" is how Mr. Schmidt described the supposed government brain-chip program. He believed it was designed to rehabilitate people who committed crimes. In his case, the chip program informed him that he had committed crimes when he was six years old and the system was trying to rehabilitate him.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

impact of Mr. Schmidt's mental illness on the offense conduct. Of course, a mechanical

Guideline sentencing recommendation is easier to justify rather than a nuanced

application of the § 3553(a) factors, but the Guidelines should not trump thought and

feeling.[2]

Since *United States v. Booker*, 543 U.S. 220 (2005), sentencing courts are no

longer bound by the United States Sentencing Guidelines, but are instead required to

impose the minimum term necessary to comply with the goals of sentencing. 18 U.S.C.

§§ 3553(a), 3582.

Judges must consider all of "the kinds of sentences available" by statute, §

3553(a)(3), even if the "kinds of sentence . . . established [by] the guidelines" permit or

encourage only prison. *See Gall v. United States*, 128 S. Ct. 586, 602 & n.11 (2007).

Despite the development of sentencing guidelines that too frequently recommend

prison, Congress expected that the threshold question in most cases would continue to

be whether probation was sufficient or whether prison was necessary. It instructed

judges as follows:

> The court, in determining *whether* to impose a term of imprisonment, and,
> *if a term of imprisonment* is to be imposed, in determining the length of
> the term, shall consider the factors set forth in section 3553(a) to the
> extent that they are applicable, recognizing that imprisonment is not an
> appropriate means of promoting correction and rehabilitation.

18 U.S.C. § 3582(a) (emphasis supplied). "This section specifies the factors to be

considered by a sentencing judge in determining *whether to impose a term of*

*imprisonment* and, if a term is to be imposed, the length of the term." S. Rep. No. 98-

225 at 116 (1983) (emphasis supplied). "The phrase 'to the extent that they are

---

[2] *See, e.g.*, Steinbeck, J., (2017) *The Grapes of Wrath*, Penguin Books. ("Some of [the landowners] hated the mathematics that drove them, and some were afraid, and some worshiped the mathematics because it provided a refuge from thought and from feeling.").

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Schmidt*, CR23-158-JCC) - 9

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

applicable' acknowledges the fact that different purposes of sentencing are sometimes served best by different sentencing alternatives." *Id.* at 119 n.415. Congress authorizes even probation for a broad range of offenses and offenders, including any offense with a statutory maximum below 25 years so long as probation is not expressly precluded. *See* 18 U.S.C. § 3561(a); 18 U.S.C. § 3559(a).

In the Sentencing Reform Act, Congress directed the Sentencing Commission to "ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society" while permitting "increased use of restitution, community service, and other alternative sentences" in all other cases. *See* Pub. L. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (emphasis added). Congress has recognized that nonviolent offenses are less serious and generally warrant a non-custodial sentence when the defendant is a first offender. *See* 28 U.S.C. § 994(j) (prison is generally inappropriate in "cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," while some term of imprisonment is generally appropriate for "a person convicted of a crime of violence that results in serious bodily injury").

Finally, the Supreme Court has recognized that even non-custodial sentences can be an appropriate sanction, for even serious offenses. The Supreme Court in *Gall* recognized the substantial restriction of liberty involved in even standard conditions of probation, *Gall*, 128 S. Ct. at 595-96 & n.4, and that in some cases, "'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.'" *Id.* at 599 (quoting district court opinion).

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Schmidt*, CR23-158-JCC) - 10

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

**A.    The History and Characteristics of Mr. Schmidt Support the Probation Department's Time-Served Recommendation.**

Except for this offense, Ms. Schmidt has been a hard-working and law-abiding person. He enlisted in the Army out of a sense of patriotism and faithfully served in the military until he had a psychotic break that led to his medical discharge. He has no criminal history, nor does he abuse alcohol or use drugs. The offense conduct is aberrant when his life is viewed as a whole.

As detailed above, Mr. Schmidt's conduct was the direct result of his schizophrenia. Fortunately, his mental health symptoms can be adequately managed with medications. His family looks forward to working with the Probation Department to make sure Mr. Schmidt's mental health needs are adequately managed and monitored upon his release from custody.

**B.    The Unique Nature and Circumstances of the Offense Warrant a Time-Served Sentence.**

Although serious, this offense was the product of Mr. Schmidt's mental illness, specifically his delusional belief that the government had implanted a chip in his brain and was controlling his thoughts. Courts have long found that mental health problems related to the offense is a mitigating factor. *See Landrigan v. Schriro*, 441 F.3d 638, 648 (9th Cir. 2006) ("Where a defendant's crime is attributable to a disadvantaged background or emotional or mental problems the defendant is less culpable than one without the excuse."). Even prior to *Booker*, the Guidelines afforded courts the discretion to depart from the Guideline range where a defendant's serious mental condition contributed to the offense. *See* U.S.S.G. § 5K.13; *United States v Chatman*, 986 F.2d 1446, 1452 (D.C. Cir. 1993) ("[T]wo of the primary rationales for punishing an individual by incarceration--desert and deterrence--lose some of their relevance when applied to those with reduced mental capacity.")

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Here, Mr. Schmidt's mental illness is not just "related to the offense," it was the sole reason he committed the offense. In his report, Dr. Stanfill addressed the relationship between Mr. Schmidt's offense conduct and his mental illness. He concluded that Mr. Schmidt's cognition and behavioral presentation during the time of the offense, between 02/2020 and 07/2020, "was a result of a chronic psychotic illness, which would be classified as a mental disease by the larger professional community." Ex. 4 at 17. Dr. Stanfill found that the offense conduct was "a direct result of his mental illness." *Id*. He continued, stating:

> In this case, Mr. Schmidt was driven by his psychotic beliefs that he needed to expose a brain computer interface that was controlled by the U.S. Government. He experienced so much despair about these delusions that he acted in an increasingly odd manner inconsistent with his baseline. Indiscriminate, bizarre, and impulsive behaviors were hallmark presentations of psychotic episodes and often occurred without complete forethought or consideration.

*Id*.

Mr. Schmidt acknowledges he initially provided protected information to the Chinese government that had nothing to do with supposed chip program. However, as found by Dr. Stanfill, he did so because of his entrenched delusional beliefs, wanting to establish credibility with the Chinese government so they would take his concerns about the brain-computer interface seriously, as others had previously dismissed them. *Id*. at 17. Dr. Stanfill notes that Mr. Schmidt's delusions were so entrenched, he "even went as far as to apply for a job at the FBI so that he could gain broader access to this 'program' and did not believe there was any inherent threat in returning to the U.S. for a 'job interview.'" *Id*. at 17. The fact that Mr. Schmidt returned to the United States despite the warnings of his MSS handler, further suggests "he did not think he was in harm's way or doing anything wrong at the time." *Id*. at 17.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

The government acknowledges that Mr. Schmidt's mental health condition played some part in the offense but argues that he really was not that mentally ill at the time of the offense and he was primarily motivated to obtain immigration status in the China. Dkts. 46, at 2, 5, 7.[3] While it is true that Mr. Schmidt's condition had deteriorated by the time he returned to the United States, the government ignores significant facts in the case that plainly demonstrate his mental health was severely compromised even before he travelled to China. According to the Indictment, the offense conduct took place from February 2020 to July 2020. Dkt. 1. The government argues that his efforts to get a visa started after he arrived in Hong Kong in early March 2020. Dkt. 46 at 5. There is voluminous evidence that Mr. Schmidt's mental health was severely impaired even before he left for China in January 2020 and during the course of the offense conduct in 2020.

- He was discharged from the military in late 2019 due to a psychotic break and was diagnosed with schizophrenia.

- His parents tried to civilly commit him on January 13, 2020, *before* he even left the country. *See* Ex. 2. This fact is noted in the discovery at USA_00001809. By then, he had accused them of trying to kill him on multiple prior occasions for the supposed crimes he had committed when he was a small child — information that "the network" had convinced him to be true. He had limited contact with his family after he left for China.[4]

---

[3] Early in the case, the government suggested to counsel that Mr. Schmidt's conduct was related to his desire for a visa to live in China to remain with his wife. However, the offense conduct took place long before he met his wife.

[4] In May 2020, Mr. Schmidt sent an email to his sister referencing the supposed mind control program, stating he "had learned terrible things about the American government." Dkt. 46-1 at 18.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

- In 2019, his Google searches suggested he was trying to communicate with "the network"[5] and he stated in a Google search that he would report the issues to China unless the network left him alone.

- In 2020, while living in Hong Kong, Mr. Schmidt was still obsessed with the mind-control program. According to discovery provided by the government, he conducted numerous Google searches related to a supposed government mind-control program between March 2020 to April 2020, which included the following: "government mind control," "government planted chip," "government microchipping," "cia brain implants dogs," "private institutions used in cia effort to control behavior," "U.S. government mind reading device," "brain computer interface," "brain implant xray," "brain computer interface show up on xray," and "brain computer interface installation video." Later in 2020, he conducted multiple searches related to Abilify, his current medication, and "brain implant MRI."

- On May 5, 2020, Mr. Schmidt obtained an MRI in Hong Kong, claiming family history of brain tumors, but was really his effort to prove the existence of the chip. *See* Ex. 6 (MRI Report).

- In March 2020, Mr. Schmidt wrote a draft email to Chinese officials stating he was disturbed about the government's "technology" which "infringes upon the privacy of the general populace." Discovery p. USA_00001859. This is likely a reference to the chip program as

---

[5] One example is the following Google search, "sos if you are reading this, I know it looks crazy to try to send a message like this. So here's some context to justify this. I don't know if you will get this. I am putting this here I the hope that you will receive this message, and take action to fix this somehow."

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Mr. Schmidt's role in human intelligence focused human sources, not technological surveillance on the "general populace."

- He tried to contact Chines authorities long before he applied for a visa in Hong Kong. He traveled to China in January 2020. He tried contacting various foreign consulates in Türkiye in February 2020. He started creating documents to give to a foreign government even before he flew to Hong Kong in March 2020 and applied for a visa while living there.

The government's suggestion that it was only in 2022 that "his thinking became more heavily dominated by his delusions", Dkt. 46, at 7, ignores significant evidence to the contrary outlined above. The defense agrees that Mr. Schmidt's conduct was intentional and planned[6] and his condition worsened over time. However, it was clear his primary intention when contacting the Chinese was to disclose the brain-chip program. He used legitimate defense information in order to gain credibility with the Chinese government so they would believe his report about the supposed mind control program. When Mr. Schmidt actually met with Chinese officials, *he told them about the mind-control program*.[7] If Mr. Schmidt was motivated by a visa, he would not have

---

[6] The government cites the supposed "operational security" used by Mr. Schmidt, noting that he insisted on an in-person meeting to discuss "this technology" and he expressed concern about discussing information over email. Dkt. 46 at 5. First, this should also be considered with the less thoughtful actions taken by Mr. Schmidt. For example, he did nothing to make his accounts anonymous — his Google searches were searched by the government and the Word documents he created were stored in an iCloud account that was accessed by the government. Second, his concerns about discussing "technology" likely refers to the supposed chip program, and he needed an in-person meeting because he knew he would not be taken seriously if he disclosed the chip program in advance.

[7] Indeed, Mr. Schmidt reported to the government that he told a Chinese police officer about the mind-control program on his first trip to China in January 2020 but was ignored and then expelled from the country because the COVID pandemic had just started.

shared this information. This demonstrates that he was fixated on the supposed mind-control program from the outset and this fixation was the impetus for him to share information with the Chinese government.

### C.    Protecting the Community Does Not Require an Additional Term of Custody.

Mr. Schmidt is not a danger to the community. He has no criminal history and committed the current non-violent offense while in the throes of a lengthy psychotic episode. After competency restoration proceedings, he has responded well to psychiatric medications which he intends to take for as long as necessary. The past two years in custody, shame, embarrassment, and other collateral consequences of this conviction will serve to encourage Mr. Schmidt to continue to take his medications and manage his serious mental illness.

Mr. Schmidt appreciates the mental health treatment he has received while in the BOP. Ex. 1. He is now properly medicated and his mental health symptoms are appropriately managed. He understands that medication compliance is important for a variety of reasons. *Id*. He does not want to live with the crushing belief that he is being controlled by a coercive government mind-control program and knows the best way to avoid that outcome is to properly manage his mental health symptoms. *Id*.

In addition, Mr. Schmidt will be subject to a lengthy term of supervised release where United States Probation will be able to monitor his mental health symptoms, medication compliance, and travel. He will also have the support of his family who are highly motivated to monitor his mental condition and compliance with medications. Ex. 2. His parents are grateful for the treatment Mr. Schmidt has received in the Bureau of Prisons and they look forward to having a concrete protocol to make sure he is managing his mental illness. *Id*. Clearly, his family will cooperate fully with the Probation Department during his term of supervised release.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

### D.    An Additional Term of Incarceration Will Not Further the Goals of General Deterrence.

A sentence longer than time-served is not needed to "send a message" and deter potential offenders, particularly in this highly unusual case. Imposing a lengthy term of custody on a person who committed the current offense as the result of delusional beliefs that were clearly the product of schizophrenia will not deter other people from committing similar crimes. Potential offenders who are not mentally ill would recognize that this case is exceptional, and potential offenders who are seriously mentally are simply not deterred by what happens in other cases.

The general belief that more severe sentences serve as a general deterrent to crime has been refuted by research. As one criminologist concluded there is "no real evidence of a deterrent effect for severity." Pasternoster, R., *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 817 (2010). Lengthy sentences do not provide meaningful deterrence because most offenders do not think about the criminal consequences of their actions. *See* Doob, A. & Webster, C., *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Just. 143, 182–83 (2003).[8] To the extent that offenders weigh the perceived costs and benefits, "in virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity.*" Pasternoster, supra*, at 812; Doob & Webster, *supra* at 189 ("no consistent and plausible evidence that harsher sentences deter crime").

The government may argue that "a message must be sent" to others. If this policy goal were supported by the scientific literature, it may weigh in favor of an

---

[8] *See generally* Joseph H. Robinson & John M. Darley, *The Role of Deterrence in the Formulation of Criminal Law Rules: At its Worst When Doing its Best*, 91 Geo. L. J. 949, 953 (2003); A. Mitchell Polinsky & Steven Shavell, *On the Disutility and Discounting of Imprisonment and the Theory of Deterrence*, 28 J. Legal Stud. 1, 4-7 (1999).

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

additional term of custody. As noted above, this reason for harsh sentences is contradicted by "virtually every deterrence study to date." *Id*. Mr. Schmidt's sentence should be determined by the unique facts and circumstances of his case. His liberty should not serve as a tool in the "message sending business."

### E.    A Time-Served Sentence is Sufficient Punishment to Promote Respect for the Law.

Courts have long recognized that even a sentence of probation is punitive and carries long-lasting consequences. *See, e.g., Gall,* 552 U.S. at 48-49 and n.4; *United States v. Braun*, 382 F. Supp. 214, 215 (S.D.N.Y. 1974) (noting the "unique agonies under the emotional stress of criminal prosecution" are real, not "trivial"). Public opinion polls reveal that prison terms are not necessary to promote respect for the law or appropriately punish. *See* Judge James S. Gwin, *Juror Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?*, 4 Harvard L. & Pol'y Rev. 173, 175 (2010).[9] Close to three-quarters (72%) of adults surveyed in 2003 either completely agreed or mostly agreed that "[t]he criminal justice system should try to rehabilitate criminals, not just punish them." Bureau of Justice Statistics, U.S. Department of Justice, *2003 Sourcebook of Criminal Justice Statistics* 139, Table 2.46.[10]

---

[9] Available at http://hlpronline.com/wp-content/uploads/2010/02/gwin_jurorsentinment.pdf.

[10] *Available at* http://www.albany.edu/sourcebook/pdf/t246.pdf. Three years later, close to two-thirds (65%) of those surveyed believed that "more money and effort should go to attacking the social and economic problems that lead to crime through better education and job training" than to "deterring crime by improving law enforcement with more prisons, police and judges." Bureau of Justice Statistics, U.S. Department of Justice, *Sourcebook of Criminal Justice Statistics Online, Attitudes Toward Approaches to Lowering the Crime Rate in the United States*, Table 2.0013.2006, available at http://www.albany.edu/sourcebook/pdf/t200132006.pdf.

Mr. Schmidt has already served two years of custody, and he will be supervised for an additional three years. He committed the offense as a direct result of his schizophrenia which is now managed with medications. Under the unique circumstances of this case an additional term of custody is not warranted to promote respect for the law.

### F.     A Time-Served Sentence Avoids Sentencing Disparities.

The government cites a number of cases in support of its recommendation. However, each case is distinguishable. The government claims *United States v. Schultz*, No. CR24-056 (M.D. Tenn.),[11] is most analogous. According to the government press release for the case, Mr. Schultz was motivated by money — he was paid $42,000 to provide sensitive information to the Chinese.[12] Also, Mr. Schultz tried to recruit others to join the scheme. *Id*. The government claims Mr. Schultz suffered from mental health issues, but those are not identified and sentencing materials are not available on the case docket. Given the financial motivation and effort to recruit others, it is extremely unlikely the mental health issues in that case were nearly as severe as Mr. Schmidt's. Also, there is no indication in the docket or plea that Mr. Schmidt's mental health issues required a competency or insanity determination. Likewise, the *Slater* case cited by the government does not appear to concern significant mental health issues. *United States v. Slater*, No. CR24-042-BCB-MDN (D. Neb.). In that case, the defendant sent information to a romantic interest who purportedly lived in Ukraine.[13] There is no indication on the docket that the defendant suffered significant mental health issues.

---

[11] The government citation for this case has the wrong year.

[12] *See* https://www.justice.gov/opa/pr/former-us-army-intelligence-analyst-sentenced-selling-sensitive-military-information.

[13] *See* https://www.justice.gov/opa/pr/air-force-employee-pleads-guilty-conspiracy-disclose-unlawfully-classified-national-defense.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

The government also cites a number of cases in which it charged a more serious offense. While the government could have pursued a more serious offense that would have raised the advisory Guideline range, that has nothing to do with the relevant § 3553(a) factors, and the other cases cited by the government were simply far more aggravated. In *Dalke*, the defendant was paid $85,000 by a supposed Russian agent to divulge information. No. CR22-00313-RM-1 (D. Col.), Dkt. 44. In *Ma*, the defense engaged in litigation to obtain access to classified information under the Classified Information Procedures Act (CIPA), was paid $50,000 for the information, and did not refer to mental health issues at sentencing. No. CR20-0083 (D. Haw.), Dkt. 141. Here, Mr. Schmidt did not engage in any discovery litigation. In *Lee*, the defense engaged in significant discovery litigation, received $840,000 in payments, and cited no mental health issues in the sentencing materials. No. CR18-00089 (E.D. Va.), Dkt. 185. In *Mallory*, the defendant went to trial, received $25,000 in payments, jeopardized the lives of human assets, and cited no mental health issues at sentencing. No. CR17-00154 (ED. Va.), Dkt. 211, at 11, 15. Finally, in *Thompson*, the defense cited no mental health issues in the sentencing materials. No. CR20-00067 (D.D.C.), Dkt. 55.

## IV.    CONCLUSION

This Court is directed to impose the minimum term of prison necessary to achieve the goals of sentencing. An additional term of imprisonment would serve no purpose at this point. Therefore, the defense respectfully requests that the Court impose a sentence of time-served with three years of supervised release. This sentence is sufficient to address the need for punishment, deterrence, and rehabilitation.

Mr. Schmidt deeply regrets his actions. Ex. 1. Now that he is appropriately medicated, it is "hard for [him] to believe how sick [he] was." *Id*. At the time he committed the offense, he believed he was the subject of a government mind-control

program. *Id*. He accepts the consequences for his actions and he will do his best to comply with supervision when he is eventually released from prison.

DATED this 22nd day of October 2025.

Respectfully submitted,

*s/ Dennis Carroll*
Senior Litigator
Office of the Federal Public Defender
Attorney for Joseph Schmidt

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Schmidt*, CR23-158-JCC) - 21

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100